**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BLASE TUCCI, | ) | Civil Action No. 2:21-cv-01859 |
| | ) | |
| Plaintiff, | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| GILEAD SCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

AND NOW, comes Plaintiff BLASE TUCCI, by and through his attorneys, Horne Daller LLC, and pursuant to a Show Cause Order entered by this Honorable Court on December 27, 2020, files this Amended Complaint the following of which is a statement:

**JURISDICTION AND PARTIES**

1.      Plaintiff, BLASE TUCCI, is an adult individual residing in Slippery Rock, Butler County, Pennsylvania 16057.

2.      Defendant, GILEAD SCIENCES, INC. ("Gilead") is a publicly traded foreign corporation with a principal place of business located at 333 Lakeside Drive, Foster City, California 94404.

3.      Gilead represents that it is a research-based biopharmaceutical company that discovers, develops and commercializes innovative medicines in areas of unmet medical needs with a goal, in part to advance their product pipeline across therapeutic areas including HIV cure research programs.

4.      Defendant Gilead regularly conducts business in the Commonwealth of Pennsylvania and throughout the Western District of Pennsylvania.

5.      At all times material hereto, the factual circumstances which give rise to this litigation occurred primarily in the Western District of Pennsylvania.

6.      During the time period relevant hereto, Mr. Tucci worked on behalf of Defendant Gilead with physician practices within the Western District of Pennsylvania, including but not limited, to UPMC.

7.      This Court has diversity jurisdiction over this action setting forth claims under Pennsylvania law and that was removed to this Court by Defendant Gilead pursuant to 28 U.S.C. § 1332(a)(2) because this action involves a citizen of this state and a foreign citizens who maintains business domiciles in different states, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because Defendants have sufficient minimum contacts with the Western District of Pennsylvania by regularly conducting business in the District, by employing individuals in the District including the Plaintiff, and by availing themselves to the commercial activities of the District through their operations.

## **FACTUAL BACKGROUND**

### _Gilead is subject to State and Federal Laws and Regulations that Control the Misuse of Public Funds in the Pharmaceutical Industry._

9.      As part of its business, Gilead works with the U.S. Centers for Disease Control and Prevention, the Food and Drug Administration, Medicare and Medicaid among other

government entities, and is subject to rules and regulations of the United States Government related to the sale, solicitation for sale and distribution of drugs and pharmaceuticals.[1]

10.    As part of the conduct of its business Gilead engages in product sales, participation in government rebates and discounts and is required to comply with rules and regulations of the United States and state entities attendant to its participation in that business.

11.    Gilead represents those sales of its products, including but not limited to HIV or hepatitis C virus (HCV), and its financial success depends, in part, on the extent of reimbursement of products by public payers including the risk that public payers will choose to exclude their products from their formulary coverage lists or limit the types of patients for whom coverage will be provided.

12.    Gilead is subject to legislative and regulatory actions affecting government prescription drug procurement and reimbursement programs including but not limited to the state and federal statutes referenced hereinafter.

13.    Gilead is subject to indirect and direct regulation of pharmaceutical drug pricing and government-imposed limitations on pharmaceutical product pricing at both the federal and state level.

14.    Gilead is potentially subject to criminal and/or civil sanctions, including but not limited to substantial fines, civil monetary penalties, exclusion from participation in federal and state health care programs, including Medicare, Medicaid, Veterans Administration health programs, and federal employee health measures for use or misuse of public funds pertaining to, *inter alia,* drug reimbursement, rebates, price reporting, health care fraud and abuse.

---

[1] **The information concerning the operations of Gilead in this section are taken from Form 10-Q Quarterly Report filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 by Gilead Sciences, Inc. for the period ending June 30, 2019 (filed 8/5/2019).**

*Mr. Tucci was Directly Involved in the Sale and Distribution of Gilead Products Under the
Auspices of Federal and State Regulation and Control*

15.     At all times material hereto Mr. Tucci understood that his conduct and activities

for and on behalf of Defendant Gilead were subject to the above referenced federal and state

regulatory controls and to the express statutory provisions referenced hereinafter.

16.     Mr, Tucci has more than 30 years' experience and a distinguished record in the

pharmaceutical sales industry.

17.     Mr. Tucci routinely held training positions with each of his employers, a role that

is assigned to employees with exceptional performance and leadership capabilities.

18.     His professional history in pharmaceutical sales is marked by high-achieving

results including over 100% quota attainment in several years and for different companies,

rankings in the top 5% of his area, excellence in leadership awards, rankings in the top 5 of

several dozen sales representatives, and numerous sales awards.

19.     In the course of his employment, Mr. Tucci had ranked, at times, as the number

one sales associate for his product with two (2) different pharmaceutical companies.

20.     Prior to commencing employment with Gilead, Mr. Tucci's employment included

eight (8) years with Glaxo Smith Kline, first as a respiratory division sales representative, then as

an oncology representative and finally in the HIV unit.

21.     After the Glaxo Smith Cline position, Mr. Tucci worked for Merck for five (5)

years initially as an HIV Clinical Specialist in sales and then in a science consultant role

concerning a Hepatitis C drug. Along with the significant sales results achieved as an HIV

clinical Specialist, Mr. Tucci was able to earn his MBA to allow for advancement of his career to

the science consultant role.

22.     Mr. Tucci continued to work with Hepatitis C medication when he was hired by Defendant in October 2015 to serve in the position of "HCV Therapeutic Specialist" for Defendant's "Pittsburgh South" territory.

23.     As an HCV Therapeutic Specialist, Mr. Tucci was responsible for pharmaceutical sales of Defendant's Hepatitis C medication throughout his region, and in that role, he developed professional relationships with medical providers interested in prescribing the Hepatitis C medication.

24.     In 2015, Mr. Tucci was a quarterly winner in the "Drive for Results" sales contest, and he had over 100% quota attainment.

25.     In 2017, Mr. Tucci won the award for Senior Regional Directors for productivity.

26.     That same year, Mr. Tucci ranked in the top 25 of 141 sales employees.

27.     In Mr. Tucci's 2017 year-end evaluation, Mr. Tucci's supervisor, Brian Vautier wrote:

>       "[Blase Tucci], based on my observations during this past year you have performed at an Exceeds level.  A #48 ranking in the salesforce is a strong achievement and one that you should be very proud of.  You are a great teammate and have supported our initiatives with respect to our POA while bringing very high quality of work every day.  I've continued to observe your customers and how they genuinely gravitate to the value you bring to them.  Your credibility within your territory is unrivaled as is the team approach and your ability to communicate with your peers on a regular basis.  You ensure to stay in close contact with all internal Gilead stakeholders as well as myself.  You have been a fantastic fit within the Gilead culture and have demonstrated our core values as well!  2018 will continue to provide ample opportunities for TS's looking to continue to grow in their leadership position as well as being a solution driven individual within our Region!  Thank you for all you do and the great year you had!"

28.     In that same review, Mr. Tucci's ethics were highlighted with the comment, "You have consistently demonstrated ethical and moral conduct" and coupled with, "Continue to act in the best interest of the company and set the standard example for all core values for our team!"

***Gilead's Employees "Selling the Spread"***

29.     In his role as an HCV Therapist, Mr. Tucci's job functions were highly regulated.

30.     In 2018, a new Hepatitis C drug entered the market from a competitor company which began to impact Gilead's sales and market lead.

31.     The result of such competition was for Gilead to shift its focus on the clinical benefits of its Hepatitis C drug and instead focus on tactics which highlighted the financial benefits of utilizing its drug, a qualifying 340B drug, touting the financial benefit compared to competitor's products.

32.     Mr. Tucci appropriately notified Gilead that its sales division personnel were engaging customers in 340B drug discount program discussion and selling customers on the financial benefits of Gilead products which claims are covered by Medicare and Medicaid.

33.     Such conduct of sales division personnel is prohibited pursuant to 62 P.S. § 1407(a)(2) which makes it unlawful to:

> solicit or receive or to offer or pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or in kind from or to any person in connection with the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program or in connection with referring an individual to a person for the furnishing or arranging for the furnishing of any services or merchandise for which payment may be made in whole or in part under the medical assistance program.

34.     This prohibited conduct, known as "340b selling" or "selling the spread" was undertaken by Mr. Tucci's supervisor's senior manager, Harry Durr, and personally witnessed by Mr. Tucci.

35.     It was also undertaken by Mr. Tucci's direct supervisor, Mr. Vautier, and personally witnessed by Mr. Tucci.

36.     These unlawful sales pitches by Mr. Durr and Mr. Vautier were not limited to a single customer or incident; rather, they occurred several times with several customers.

37.     In response to this unlawful conduct, Mr. Tucci escalated this matter as set forth more fully below.

### *Defendant Directs Plaintiff to Steal Confidential Information*

38.     One of Mr. Tucci's largest accounts was University of Pittsburgh Medical Center ("UPMC").

39.     Mr. Tucci was pressured by his supervisors to acquire internal and confidential UPMC materials that would provide Gilead a competitive advantage in the market and assist in its negotiations with UPMC.

40.     The direction to acquire the confidential information came from Mr. Vautier who represented to Mr. Tucci that his supervisor, Mr. Durr, was directing the conduct.

41.     Specifically, Mr. Tucci was directed to obtain a treatment algorithm that describes the protocols physicians are supposed to follow in treating Hepatitis C.

42.     Gilead wanted Mr. Tucci to obtain a memo identifying the algorithm and how the competitor's drug was being used.

43.     On information and belief, the information sought is a trade secret of UPMC.

44.     His supervisor, Mr. Vautier, pressured both Mr. Tucci to obtain and an employee of UPMC to disclose the information, and when the UPMC employee declined to disclose confidential UPMC information, Mr. Vautier expressed that if they could not obtain the information, Mr. Durr intended to fire both Mr. Tucci and Mr. Vautier.

45.     Moreover, Gilead encouraged Mr. Tucci to mislead UPMC employees into providing the detail.

46.     Such conduct is expressly prohibited by the Pennsylvania Uniform Trade Secrets Act.  12 Pa.C.S. § 5301 *et seq.* (prohibiting using "improper means" to misappropriate a trade secret).

47.     At all times material hereto Mr. Tucci further believed that such conduct would violate further legislative and regulatory actions affecting government prescription drug procurement and reimbursement programs.

48.     Mr. Vautier expressed to Mr. Tucci that if Mr. Tucci failed to obtain the confidential documents, Mr. Tucci should expect to be terminated.

49.     Mr. Tucci declined to mislead UPMC or otherwise obtain the confidential information and, as a result, Mr. Vautier attempted to pressure UPMC into producing it; UPMC declined.

50.     Mr. Tucci also escalated this concern as set forth more fully below.

### *Defendant Provides Sales Division False and Misleading Information*

51.     The Managed Care division was tasked with meeting with administrators of managed care plans to negotiate contracts on behalf of Gilead for its formulary status, whether as preferred status, a covered status, not approved or otherwise.  In general, the lower the tier the higher the ultimate cost to the patient.

52.     The higher the tier status the greater the likelihood a product would be prescribed by health care providers.

53.     "Fingertip Formularies" were developed through a third-party entity.

54.     The formularies were grids employees customized based on the third-party product as supplemented and updated with information from the Managed Care division that reflected managed care coverage for a product in a given territory

55.     The Fingertip Formularies were then used by sales representatives to provide to their customers, health care providers.

56.     The formularies were causing the sales division to provide false and misleading information to insurance providers.

57.     More specifically, the formularies were representing coverage of Gilead's drugs under a plan when, in actuality, the drugs were not covered and vice versa.

58.     For example, a formulary might show that under UPMC's health plan, Hepatitis C medicines were covered when they were not.

59.     As a consequence, sales representatives, relying on the formularies, would suggest to physicians that they could issue prescriptions as the drug would be covered under the plan, when in actuality, it was not.

60.     On information and belief, the conduct of Gilead violates both federal and state laws and regulations in general and as more specifically set forth herein and which conduct, if he participated in it or failed to report did or could constitute participation in a misuse of government funds.

61.     Mr. Tucci received training during his employment with Gilead that identified such conduct as violative of federal and state law and activities that constituted a misuse of public funds.  That information is in the possession of Defendant Gilead.

62.     At all times material hereto, Mr. Tucci believed and understood that he had a legal obligation to report the conduct, including improper sales practices, that resulted in a misuse of public funds.

63.     Gilead failed to take appropriate action in response to Mr. Tucci's complaint to ensure that the formularies were providing truthful information or to enable sales representatives to provide accurate information.

64.     Mr. Tucci also escalated this concern as set forth more fully below.

**_Plaintiff Reports Misconduct_**

65.     On August 29, 2018, Mr. Tucci sent a letter to the HCV Business Conduct division of Gilead Sciences.

66.     In his letter, Mr. Tucci indicated, "I am writing to provide notice regarding my observation of several instances of conduct and activities that are contrary to Gilead Science Business Conduct requirements and potentially violate or risk violation of Federal and State laws."

67.     He further provided, "I understand my responsibility to report these concerns, however, I do so with a great deal of trepidation.  I accept my responsibility to report, however, I cannot envision any positive career outcome for having done so."

68.     Mr. Tucci then set forth the allegations of misconduct described above – selling the spread, direction to misappropriate trade secrets, and inaccurate sales data being provided to customers.

69.     Mr. Tucci made himself available to cooperate in any investigation and provide any additional information.

70.     In response thereto, an investigation was launched by Gilead's legal department into Mr. Tucci's claims, and Mr. Tucci participated in providing information incident to that investigation.

71.     Mr. Tucci identified both Mr. Vautier and Mr. Durr in the course of the investigation.

72.     Mr. Tucci encouraged Gilead to speak to the customers, and Gilead indicated it was not likely to engage in those conversations.

73.     In the course of the investigation, Mr. Tucci asked whether it was appropriate to engage in the conduct he outlined, and Gilead responded that it was not.

74.     Mr. Tucci did not receive any information from Gilead as to the outcome of the investigation, if any.

### *Defendant Retaliates Against Plaintiff for Reporting Misconduct*

75.     For years, Mr. Tucci had been an elite sales representative for Gilead, garnering numerous accolades and awards.  He routinely satisfied his sales goals.

76.     In 2017, the year prior to the complaint, he won the Senior Regional Directors award for productivity as having been in the top 20% of the company's sales force.

77.     From 2015-2017, Mr. Tucci received multiple quarterly contest awards for satisfying and/or exceeding sales goals.

78.     In 2017 and 2018, Mr. Tucci was appointed as a Regional Trainer, an appointment given to employees who have made significant contributions and evidence leadership in the workforce.

79.     The tenor of Gilead toward Mr. Tucci changed dramatically after his report of misconduct.

80.     After Mr. Tucci's complaint to Gilead's Business Conduct division, Mr. Tucci's supervisor, Mr. Vautier, met with Mr. Tucci and suddenly began raising issues concerning Mr. Tucci's performance.

81.     Mr. Vautier began micromanaging Mr. Tucci's performance which had been exemplary prior to the complaint.

82.     He offered that he would be willing to make Mr. Tucci's job difficult through various report requirements.

83.     The goal was to make the atmosphere so untenable that Mr. Tucci would be compelled to resign.

84.     Mr. Tucci quickly realized the actions as retaliation, as he was suddenly subjected to a myriad of tasks from Mr. Vautier that were previously not required.

85.     By way of example, Mr. Tucci was made to produce calendar reports to Mr. Vautier, and Mr. Tucci began receiving negative field contact reports despite having previously been commended for his work by Mr. Vautier.

86.     Mr. Vautier wanted to suggest Mr. Tucci was underperforming, but in 2018, as a result of a resignation of a Pittsburg North representative, Mr. Tucci was tasked with covering the vacancy as well as handling his own territory responsibilities.

87.     On December 28, 2018, Mr. Tucci again contacted Gilead's legal department to report that he was the subject of harassment and retaliation by management as a result of his reporting misconduct.

88.     As a consequence of Mr. Vautier's retaliation, Mr. Tucci requested either relocation or a new supervisor; Mr. Tucci's requests were denied.

89.     Instead, Gilead informed Mr. Tucci that it determined his complaint of harassment and retaliation to be unsupported.

90.     And yet, in another act of retaliation, after the complaint to Human Resources of harassment and retaliation by Mr. Vautier, Mr. Tucci was placed on a Performance Improvement Plan ("PIP") that was monitored and controlled by Mr. Vautier, the subject of Mr. Tucci's complaints.

91.     Historically, Mr. Tucci's performance, as was the case with other sales representatives, was based upon sales goals.

92.     In 2018, Mr. Tucci was satisfying his sales goals, and as a result, Mr. Vautier could not assert underperformance.

93.     To justify his action in implementing the PIP, Mr. Vautier instead changed Mr. Tucci's performance metric to a market share analysis, a metric that had never been previously applied and, on information and belief, was not used to measure the performance of other sales representatives.

94.     A market share analysis does not account for limits on market share created by factors outside the control of a Gilead salesperson.

95.     The territory assigned to Mr. Tucci during the relevant time provided access to approximately 15% of the related drug use market.

96.     By way of example, as a result of reimbursement issues that had arisen between UPMC and Gilead, and which are outside of the control of the salesperson, UPMC was directing its physicians not to use products offered by Gilead and ultimately removed Gilead from the

formulary.  UPMC physicians presented the bulk of Mr. Tucci's potential customers during this time period.

97.     As Gilead knew at the time, its hepatitis C market share was declining overall and in Mr. Tucci's territory was experiencing a disproportionately larger loss of market share as a direct result of that independent business dispute between UPMC and Gilead and over which Mr. Tucci had no control.

98.     Further, Mr. Vautier falsified documentation by indicating that Mr. Tucci was below average in frequency numbers, and he refused to amend the report after Mr. Tucci provided support for the incorrect data.

99.     Mr. Vautier also intentionally documented inaccurate numbers for Mr. Tucci's strategic approach to make it seem as though Mr. Tucci was underperforming when he was not.

100.    Mr. Vautier also penalized Mr. Tucci in the PIP for field time that was a result of Mr. Vautier's refusal to join Mr. Tucci in the field.

101.    Mr. Vautier also increased his micromanagement of Mr. Tucci by requiring:

   i.   Weekly updates to management;

   ii.   Tracking of frequency of communications on a list of providers;

   iii.   Utilizing alternative access opportunities such as educational speaker programs of approximately 3-4 events per week and provide weekly reports;

   iv.   Discuss call average on a weekly basis;

   v.   Weekly e-mail report on the growth or decline in parity market opportunities and include an updated strategic plan for each, highlighting new access sites and appointments;

vi.   Provide a weekly routing document prior to entering the field each week;

vii.   30-minute calls every Friday for a progress update; and

viii.   Provide a minimum of a week's notice when a field day is built in to see at least 4-5 targets and 2-3 market development calls.

102.   Mr. Tucci complied with each of these obligations, and yet Mr. Vautier refused to acknowledge the same in his evaluation of the PIP.

103.   Instead, Mr. Vautier, by purposefully providing false and misleading information in the PIP, caused Mr. Tucci to be harmed in the terms and conditions of his employment.

104.   That conduct was ratified by Gilead when it refused to properly and thoroughly investigate Mr. Tucci's concerns of retaliation in good faith or consider Mr. Vautier's retaliatory intent in fashioning and reporting the PIP.

105.   Mr. Tucci was ultimately terminated for failing to satisfy the objectives of the PIP which largely focused on the basis of market share performance rather than the sales performance he was satisfying and the standard to which other sales representatives were held.

106.   Mr. Tucci was harmed in his professional reputation as it was rare for Gilead to terminate employment with a sales representative for performance because the sales data is unreliable and not easily tracked.

107.   To the extent sales data existed for Mr. Tucci, he was meeting all sales goals at that time.

108.   Gilead, therefore, concocted a false narrative concerning Mr. Tucci's performance to justify its unlawful termination.

*__Harm to Mr. Tucci__*

109.   The conduct directed at Mr. Tucci was egregious.

110.   Mr. Tucci had an obligation to report the unlawful activity to management and, recognizing the risk it posed to him in his employment, he complied with that obligation.

111.   Mr. Tucci was requested to engage in conduct that, had he done so, positioned him for termination and possibly criminal and civil liability.

112.   The action requested by Gilead violated the law and its own internal policies.

113.   The action requested by Gilead violates its core tenant of employee integrity.

114.   Mr. Tucci reported the wrongful conduct, as required, and found himself placed on a track to termination, his pleas to Gilead concerning retaliation notwithstanding.

115.   The persons engaged in the wrongful conduct, on the other hand, remained fully employed.

## COUNT I

## VIOLATION OF PENNSYLVANIA WHISTLEBLOWER ACT

116.   The above paragraphs are incorporated as though each paragraph were set forth fully herein.

117.   Pennsylvania enacted a statute to prohibit retaliatory efforts by employers in response to lawful employee complaints.  43 P.S. § 1421 *et seq.* ("Pennsylvania Whistleblower Act").

118.   Gilead constitutes an employer within the definition of the Whistleblower Act, 43 P.S. § 1422 in that Gilead is a for profit corporation which receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body.

119.    The Pennsylvania Whistleblower Act provides, "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act."  43 P.S. § 1423(a).

120.    "Waste" is defined as "An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."  43 P.S. § 1422 "Waste."

121.    "Wrongdoing" is defined as "A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or a code of conduct or ethics designed to protect the interest of the public or the employer."  43 P.S. § 1422 "Wrongdoing."

122.    Gilead is subject to the Pennsylvania Whistleblower Act as it is a corporation for profit that receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body.  43 P.S. § 1422 "Employer (4)."

123.    Pennsylvania's Whistleblower Act provides that the report may be made to the employee's superiors, an agent of the employer, or to any appropriate authority.  43 P.S. § 1424 (b).

124.    In this instance, Mr. Tucci made a report of wrongdoing and/or waste to his supervisors and Gilead's Business Conduct Department and concerning conduct that violated

laws that were designed to benefit or protect the general public.  He subsequently participated in an interview conducted at the direction of Gilead's legal counsel.

125.    Mr. Tucci reported waste and/or wrongdoing as set forth above by providing support for allegations of managerial employees selling the spread on drugs and by demonstrating that Gilead's representatives were providing false information concerning drug coverage, both of which impact pharmaceuticals covered by Medicare and Medicaid.

126.    Mr. Tucci's conduct in both reporting and participating in an investigation into his report constitutes protected conduct under Pennsylvania's Whistleblower Law.

127.    Mr. Tucci's reports were acknowledged by Gilead as appropriate reports of misconduct, waste and/or wrongdoing.

128.    Gilead's actions, as set forth herein, were not separate and legitimate, nor were they merely pretextual.

129.    Mr. Tucci was the subject of retaliation directed at interfering and chilling his legally protected rights and for the purpose of making an example to other employees the consequence of advancing those legally protected rights.

130.    More specifically, Mr. Tucci was harmed in the retaliatory measures taken to undermine him in the performance of his job duties and ultimately in the termination of his employment as a result of his refusal to engage in conduct that violates his professional, ethical, and legal obligations.

131.    The conduct of Gilead serves to send a message to its employees that any pushback, even when required by law, will be met with adverse employment action.

132.    Gilead's conduct forces employees into a Hobson's choice in which they are forced to make decisions that can expose them to substantial civil, criminal, and professional liability.

133.    The termination of Mr. Tucci as a consequence of his refusal to break the law is outrageous and/or reckless conduct by Gilead.

134.    As a direct and proximate result of Gilead's unlawful conduct, Mr. Tucci was deprived of his job and has lost income in the form of wages, benefits, and future job opportunities.

135.    As a direct and proximate result of Gilead's unlawful conduct, Mr. Tucci has suffered noneconomic losses consistent with Pa.R.C.P. 223.3.

WHEREFORE, for the foregoing reasons, Plaintiff, BLASE TUCCI, requests that the Court grant the relief prayed for hereinafter.


## COUNT II

### WRONGFUL DISCHARGE

136.    The above paragraphs are incorporated as though each paragraph were set forth fully herein.

137.    Pennsylvania common law specifically prohibits termination of an employee when such termination is contrary to an expressed public policy of the Commonwealth.

138.    In this case, a series of public policies are at the basis of Mr. Tucci's wrongful discharge claim.

139.    First, the Pennsylvania Uniform Trade Secrets Act prohibits using "improper means" to misappropriate a trade secret.  12 Pa.C.S. § 5301 *et seq.*

140. "Improper means" includes misrepresentation and/or inducement of a breach of duty to maintain secrecy." 12 Pa.C.S. §5302.

141. At all times material hereto, Mr. Tucci also believed and understood that this conduct further violated other applicable legislative and regulatory actions affecting government prescription drug procurement and reimbursement programs.

142. Mr. Tucci was directed to steal UPMC's trade secrets and data, by intentionally misleading UPMC, for Gilead's advantage in its negotiations with UPMC.

143. Mr. Tucci was threatened with termination for refusing to comply with the directive.

144. When Mr. Tucci reported that threat, he faced retaliation and termination of his employment.

145. Importantly, theft of UPMC's trade secrets potentially subjected Mr. Tucci to substantial civil liability including monetary damages and exemplary damages correlated to the value of the proprietary information.  12 Pa.C.S. § 5304.

146. Not only would Mr. Tucci have faced possible civil liability, but the conduct would have also constituted theft of trade secrets, a felony of the third degree.  18 Pa.C.S. § 3930.

147. Second, an employer cannot require an employee to commit a crime nor can an employer prevent an employee from complying with a statutory duty.

148. Pennsylvania's criminal code prohibits insurance fraud.  18 Pa.C.S. § 4117.

149. In addition, Pennsylvania's Controlled Substances, Drug, Device, and Cosmetic Act expressly prohibits the dissemination or publication of any false or misleading advertisement as well as the furnishing of false or fraudulent material information in, or omissions of any

material information from any application, report, or other document required to be kept or filed

under the Act, or any record required to be kept by the Act.  35 P.S. § 780-113(3), (28).

150.    Pennsylvania's Controlled Substances, Drug, Device, and Cosmetic Act expressly

prohibits the dissemination of the misinformation Mr. Tucci indicated was the consequence of

inaccurate sales data provided by the Managed Care group.

151.    The response of Gilead was not to correct the inaccurate and false information

contained within the formularies to comply with the law, but rather, to ignore the complaint by

Mr. Tucci.

152.    Third, Pennsylvania prohibits false Medicare claims pursuant to 62 P.S. § 1407.

153.    More specifically, the statute makes it unlawful to "solicit or receive or to offer or

pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or

in kind, from or to any person, in connection with the furnishing of services or merchandise for

which payment may be in whole or in part under the medical assistance program or in connection

with referring an individual to a person for the furnishing or arranging for the furnishing of any

services or merchandise for which payment may be made in whole or in part under the medical

assistance program."  62 P.S. § 1407(a)(2).

154.    In addition, Pennsylvania's Medicaid Anti-Fraud Statute prohibits solicitation or

receipt or offer of payment of any remuneration in connection with furnishing service or

merchandise for which payment may be paid in whole or in part under Pennsylvania Medicaid.

62 Penn. State. § 1407(2).

155.    Both Pennsylvania's Medicare Fraud statute and Pennsylvania's Medicaid statute

carry civil and criminal liability for violations.

156.     Mr. Tucci properly reported witnessing his supervisors "selling the spread" and/or "304b selling" which is expressly prohibited under the Medicare statute.  62 P.S. § 1407(a)(2).

157.     In each instance, Mr. Tucci was subjected to a pattern and practice of retaliatory conduct for properly reporting information.

158.     Mr. Tucci was the subject of retaliation directed at interfering and chilling his legally protected rights and for the purpose of making an example to other employees the consequence of advancing those legally protected rights.

159.     More specifically, Mr. Tucci was harmed in the retaliatory measures taken to undermine him in the performance of his job duties and ultimately in the termination of his employment as a result of his refusal to engage in conduct that violate his professional, ethical, and legal obligations.

160.     The conduct of Gilead serves to send a message to its employees that any pushback, even when required by law, will be met with adverse employment action.

161.     Gilead's conduct forces employees into a corner in which they are forced to make decisions that can expose them to substantial civil, criminal, and professional liability.

162.     The termination of Mr. Tucci as a consequence of his refusal to break the law is outrageous and/or reckless conduct by Gilead.

163.     As a direct and proximate result of Gilead's unlawful conduct, Mr. Tucci was deprived of his job and has lost income in the form of wages, benefits, and future job opportunities.

164.     As a direct and proximate result of Gilead's unlawful conduct, Mr. Tucci has suffered noneconomic losses consistent with Pa.R.C.P. 223.3.

165.    The conduct of Gilead was willful, wanton, outrageous and/or done in reckless disregard of the rights of Mr. Tucci, supporting an award of punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff, BLASE TUCCI, requests that the Court grant the relief prayed for hereinafter.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff, BLASE TUCCI, requests that the Court grant the following relief against the Defendant, in a sum in excess of the arbitration limits of the court, including but not limited to the following relief:

a)    Compensation for past and future lost wages;

b)    Compensation for past and future lost benefits;

c)    Actual damages;

d)    Noneconomic losses consistent with Pa.R.C.P. 223.3;

e)    General compensatory damages, including harm to reputation, as appropriate;

f)    Expert fees and other costs of suit;

g)    Attorney's fees;

h)    Punitive damages as appropriate; and

i)    Such further legal and equitable relief as this court deems just and proper.

**JURY TRIAL DEMANDED**                    Respectfully Submitted,

*/s/Vicki Kuftic Horne*
Vicki Kuftic Horne, Esq. (Pa. 36578)
Nicole Daller, Esq. (Pa. 312224)

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
Phone: (412) 967-9400
Fax: (412) 967-0465
vkhorne@hornedaller.com
ndaller@hornedaller.com


Attorneys for Plaintiff