## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BLASE TUCCI, | ) | |
| | ) | |
| Plaintiff, | ) | 2:21-CV-1859-NR |
| | ) | |
| v. | ) | |
| | ) | |
| GILEAD SCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Plaintiff Blase Tucci claims Defendant Gilead Sciences, Inc., his former employer, wrongfully terminated his employment, in contravention to the Pennsylvania Whistleblower Law and Pennsylvania common law. Gilead now moves for summary judgment, arguing that the undisputed material facts show that the Whistleblower Law does not apply to it and that it was free to terminate Mr. Tucci's at-will employment. On careful review, the Court will grant summary judgment in Gilead's favor as to Mr. Tucci's Whistleblower Law claim, but will deny summary judgment as to the wrongful-discharge claim.

## BACKGROUND

Construing the facts in Mr. Tucci's best light, Mr. Tucci was an at-will employee of Gilead, working as an HCV Therapeutic Specialist selling treatments for Hepatitis C from 2015 to 2019. ECF 121-1, Ex. 1, 38:25-39:15; ECF 121-13, Ex. 13, p. 2. Mr. Tucci was responsible for selling two of Gilead's three HCV drugs in the Pittsburgh-South territory, where one of his largest customers was the UPMC healthcare network. ECF 121-1, Ex. 1, 38:25-39:15, 69:24-70:5. Mr. Tucci was initially successful in his job performance. *Id.* at 64:12-22; ECF 121-16, Ex. 16.

But beginning in late 2017 to early 2018, Gilead's drug sales to UPMC suffered a "dramatic decline." ECF 121-1, Ex. 1, 72:16-73:23, 75:10-17. This drop coincided

with the appearance of a new drug, Mavyret, that was competitive with and cheaper than Gilead's HCV treatments.  *Id.* at 39:16-40:2, 75:2-17.

In November 2017, Mr. Tucci attended a conference of the Community Liver Alliance with about a hundred relevant industry professionals, including healthcare specialists and pharmaceutical representatives.  *Id.* at 73:14-23, 74:13-75:1.  He heard a "buzzing around the room" that UPMC had instituted a new policy of prescribing Mavyret instead of Gilead's drugs in nearly all situations.  *Id.* at 72:16-75:1; ECF 121-18, Ex. 18.  Soon after, in early 2018, multiple UPMC physicians confirmed to Mr. Tucci that they had been directed to stop prescribing Gilead's drugs to treat Hepatitis C, and that this policy was memorialized in a "memo" or other "directive."[1]  ECF 121-1, Ex. 1, 84:7-90:18.  Mr. Tucci also learned about and viewed an "algorithm" reflecting how UPMC physicians "were supposed to use Mavyret" instead of Gilead's products.  *Id.* at 128:9-130:7.  This algorithm was a "complex chart" that told physicians when they should prescribe Mavyret or Gilead's drugs, based on a given patient's symptoms and other factors.  *Id.* at 131:14-132:11.  Mr. Tucci understood the algorithm as a more detailed version of the memo.  *Id.* at 131:14-132:17.

Mr. Tucci informed his supervisors, Brian Vautier and Harry Durr, about the memo and policy shift in an email "recap of the UPMC situation."  *Id.* at 106:3-5; ECF 121-18, Ex. 18.  That's when everything changed, he says, because Mr. Vautier and Mr. Durr pressured him to engage in three improper—and potentially criminal—practices.

First, he alleges that Mr. Vautier instructed him to obtain a copy of the UPMC memo or algorithm.  ECF 121-1, Ex. 1, 133:13-134:10.  Mr. Tucci asked multiple

---

[1] Mr. Tucci used the word "memo" as a shorthand for the directive to UPMC physicians to prescribe Mavyret over Gilead's drugs.  ECF 121-1, Ex. 1, 85:10-17.  The Court will do the same.

physicians for a copy, but they all refused because the memo and algorithm were "confidential." *Id.* at 126:15-127:18, 133:15-17. Mr. Tucci asserts that, throughout 2018, Mr. Vautier consistently asked him to obtain a copy of the UPMC memo or algorithm and told him that they would both lose their jobs by the end of the year if they could not secure the documents. *Id.* at 122:3-17; ECF 121-29, Ex. 29.

Second, he says that he witnessed his managers try to persuade UPMC representatives to buy Gilead's drugs over Mavyret by focusing on the Gilead drugs' qualification for the 340B Drug Pricing Program and that his managers pushed him to sell this financial benefit to UPMC representatives, as well. ECF 121-22, Ex. 22; ECF 121-42, Ex. 42; ECF 121-43, Ex. 43; ECF 121-44, Ex. 44. As explained in more detail below, the 340B program sets a maximum price on certain drugs for qualifying entities like UPMC, and the buyer (*e.g.*, UPMC) can receive a rebate for "the spread," *i.e.*, the difference in the price paid and the maximum price. ECF 121-2, Ex. 2, 75:6-78:24; ECF 127, pp. 5-6. Mr. Tucci alleges that his managers tried to persuade UPMC physicians to prescribe Gilead's drugs by "selling the spread"—that is, focusing on the financial rebate that UPMC would receive if it prescribed Gilead's covered drugs—a practice that he says violated Gilead policy and Pennsylvania law. He also claims that his managers pushed him to sell the spread. ECF 121-42, Ex. 42; ECF 121-43, Ex. 43; ECF 121-44, Ex. 44.

Third, Mr. Tucci alleges that Gilead used inaccurate "fingertip formularies," which are "charts prepared by a Gilead contractor that identify whether Gilead products are on formulary" and which Therapeutic Specialists relied on when communicating with prescribing physicians. ECF 127, p. 6; ECF 128-1, Ex. 67, 189:8-191:22. Mr. Tucci says Gilead's inaccurate fingertip formularies were unlawful because they were deceptive and misleading regarding insurance coverage. *Id.*

Mr. Tucci was troubled by his supervisors' behavior and began documenting it. *E.g.*, ECF 121-42, Ex. 42; ECF 121-43, Ex. 43; ECF 121-44, Ex. 44; ECF 121-45, Ex.

45; ECF 121-46, Ex. 46.  Meanwhile, his sales numbers declined, and his managers expressed concern with his performance.  ECF 121-1, Ex. 1, 72:16-73:23; 79:20-81:22, 139:17-140:19.  In July 2018, Mr. Vautier rated Mr. Tucci as "off-track" at his mid-year review.  ECF 121-23, Ex. 23.  It was the first time Mr. Tucci had received such a rating.  ECF 127, p. 5.  Mr. Vautier pushed him to "get in front of the right people" to correct course and boost his numbers.  ECF 121-24, Ex. 24.

On August 29, 2018, Mr. Tucci reported his managers' allegedly improper practices to Gilead's Business Conduct Unit.  ECF 121-25, Ex. 25.  Gilead investigated the allegations, including by interviewing Mr. Vautier and Mr. Durr; neither was given a warning or subjected to corrective action.  ECF 121-26, Ex. 26; ECF 128-7, Ex. 73, 14:22-19:8.

On December 28, 2018, Mr. Tucci reported to Gilead's legal department his concerns that his supervisors were retaliating against him for his August 2018 Business Conduct Report.  ECF 121-29, Ex. 29.  Gilead's Director of Employee Relations investigated his concerns and found them to be unsubstantiated.  ECF 121-31, Ex. 31.

Mr. Tucci was placed on a Performance Improvement Plan in June 2019, and he was ultimately terminated on August 23, 2019.  ECF 121-1, Ex. 1, 276:9-22; ECF 121-35, Ex. 35; ECF 121-37, Ex. 37.  Gilead claims that Mr. Tucci was terminated for poor performance, following "an extended period of performance coaching" and his "failure to satisfy the objectives of his PIP."  ECF 120, p. 23.  Mr. Tucci says that his

poor performance was fabricated by his supervisors as retaliation for his August 2018 Business Conduct Report.

After being terminated, Mr. Tucci sued Gilead.  He brought claims against Gilead for violating the Pennsylvania Whistleblower Law (Count I) and common law wrongful termination (Count II).  ECF 1-1.

After Mr. Tucci twice amended his complaint (ECF 8; ECF 35), Gilead moved to dismiss, largely on grounds that Mr. Tucci had failed to plead that Gilead was an "employer" under the Whistleblower Law.  ECF 36; ECF 37.  The Court denied the motion, finding that the complaint adequately alleged that UPMC received Medicaid funds from the Commonwealth, making it a "public body," and that Gilead received those same dollars as payment for its drugs, making it an "employer" that "receive[s] money from [] a public body."  *Tucci v. Gilead Scis., Inc.*, No. 21-1859, 2023 WL 2139931, at *2 (W.D. Pa. Feb. 21, 2023) (Ranjan, J.) (cleaned up).

Following discovery, Gilead moved for summary judgment (ECF 119), and Mr. Tucci opposed the motion (ECF 126).  The motion is now ready for disposition.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up).  The moving party bears the initial burden to show the absence of a genuine dispute of

material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" summary judgment is improper. *Id.* (citation omitted).

But if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).

## DISCUSSION & ANALYSIS

### I.    Mr. Tucci cannot receive whistleblower protection because Gilead is not an "employer" under the Whistleblower Law.

The Whistleblower Law makes it unlawful for a covered employer to discharge an employee for making a good faith report of "wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 Pa. Stat. Ann. § 1423(a). The central question in this case has been whether Gilead qualifies as an "employer," or more specifically, a "corporation for profit" that "receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body[.]"[2] *Id.* § 1422. If it isn't, then the Whistleblower Law's retaliation protections do not apply to Mr. Tucci, and

---

[2] Mr. Tucci argues that Gilead also qualifies as a "public body" under the law, but the Court rejected that argument in its order on the motion to dismiss. *Tucci*, 2023 WL 2139931, at *1 n.2; ECF 127, p. 14. The law of the case precludes Mr. Tucci from raising this argument from the dead. *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009). Even if the Court did consider the argument, it fails on the merits for the reasons explained below.

summary judgment must be granted for Gilead on Count I of the second amended complaint.

This inquiry proceeds in two steps. "First, the Court must determine whether UPMC is a 'public body,' which the Whistleblower Law defines in relevant part as: 'Any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body.' Second, if the Court concludes UPMC is a public body, it must then decide whether Gilead is an 'employer'—which, as noted above, means a 'corporation for profit" that 'receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body.'" *Tucci*, 2023 WL 2139931, at *1 (citations omitted).

At the motion-to-dismiss stage, the Court found that Mr. Tucci adequately pleaded that Gilead was an "employer" under the Whistleblower Law. The complaint alleged that Gilead received Commonwealth funds from UPMC, a "public body" that was "funded in any amount by or through" the Commonwealth. *Id.* at *2 (cleaned up). Specifically, the complaint alleged that UPMC received Commonwealth funds through Medicaid and the 340B Drug Pricing Program, which made UPMC a "public body"; those funds in turn flowed to Gilead as payment for its drugs, meaning Gilead qualified as an "employer" that received money from a public body. *Id.* To make this finding, the Court relied on recent state and federal court decisions concluding "that a healthcare provider's receipt of Medicaid funds from the Commonwealth in any amount makes it a 'public body.'" *Id.*

Gilead argued that this reading inappropriately expanded the reach of the Whistleblower Law to "any private entity that does business with a recipient of Commonwealth funds." ECF 37, p. 8. But the Court rejected that position for two reasons. First, the Court interpreted the text of the Whistleblower Law as being

intentionally expansive to reach private corporations that received public funding or performed work for or provided services to a public body. *Tucci*, 2023 WL 2139931, at \*2. Second, and more importantly, the Court concluded that the law expressed a "limiting principle" that "employees of private companies ***that touch the same Commonwealth funds as the public body***—here, UPMC—receive whistleblower protection." *Id.* at \*3 (emphasis added). And at the motion-to-dismiss stage, accepting all well-pled allegations as true and drawing all inferences in Mr. Tucci's favor, the Court concluded "that Gilead is such a company." *Id.*

As is often the case, new facts have emerged in discovery. The factual record now shows that Gilead doesn't "touch the same Commonwealth funds" as UPMC, and so it cannot be an "employer" under the Whistleblower Law. Thus, Gilead is entitled to summary judgment as to Count I of the second amended complaint.

Both parties rely on the undisputed testimony of Ashley Bender Spirn, a Gilead employee, to explain the flow of funds under Medicaid and the 340B Drug Pricing Program. *E.g.*, ECF 127, p. 14. The Court summarizes that flow now.

First, Medicaid. The process begins when Gilead sells its drugs to a wholesaler. ECF 121-2, Ex. 2, 63:5-8, 79:6-10. Title to the goods passes from Gilead to the wholesaler upon sale, and the wholesaler pays Gilead "when it purchases the product . . . . Just as if the drug were any other widget in the market, when purchase is made, payment is made." *Id.* at 80:5-8. The wholesaler sells the drugs to a pharmacy (*e.g.*, a pharmacy in a UPMC hospital). *Id.* at 63:19-25. The pharmacy then "dispenses" the drug to a Medicaid patient with a prescription; the patient does not pay the pharmacy. *Id.* at 64:14-24.

At this point, the state Medicaid program steps in, acting "as an insurance company" to "reimburse the pharmacy for the product the pharmacy purchased [from the wholesaler] and dispensed to [the patient]." *Id.* at 64:1-6. In other words, after receiving a claim for reimbursement from the pharmacy, "the Medicaid program . . .

pay[s] directly to the pharmacy provider for the product dispensed to the patient. So that is money that goes from the Medicaid program to the provider [pharmacy]." *Id.* at 61:21-62:6. The Medicaid program then provides an invoice of the reimbursement to Gilead, who is "under obligation by statute to provide . . . a mandatory rebate to the state Medicaid program." *Id.* at 62:7-14.

The 340B Drug Pricing Program works similarly. In this program, Gilead and the wholesaler reach a "negotiated price" at which the wholesaler buys the drugs from Gilead. *Id.* at 76:12-16. Then, Gilead indicates to the wholesaler "the price at which the wholesaler should sell products to downstream entities" such as pharmacies. *Id.* at 75:6-14. One of the prices that Gilead tells the wholesaler to sell at is the "ceiling price" for drugs that qualify under the 340B Drug Pricing Program. *Id.* at 75:15-20. That ceiling price sets the maximum price at which a 340B-covered entity can buy the drug from the wholesaler. *Id.*

If the "negotiated price" between Gilead and the wholesaler is higher than the 340B ceiling price, then the downstream buyer (*e.g.*, a UPMC pharmacy) buys the drug from the wholesaler at the ceiling price; then, the wholesaler issues a "charge back" receipt to Gilead for the difference between the negotiated price and the ceiling price. *Id.* at 76:12-77:21. It is not a prerequisite that the downstream buyer be a beneficiary of Medicare, Medicaid, or some other government entity—the buyer could be covered by a private insurer or other commercial payer. *Id.* at 78:6-19.

As is clear from the above undisputed facts, Gilead doesn't receive any money from the Commonwealth or another "public body" like UPMC via these programs. Just the opposite—Gilead pays rebates to the state Medicaid programs or reimburses wholesalers that receive money from public bodies when Gilead's contract price

exceeds the 340B ceiling price.  Thus, the record shows that Gilead is not an "employer" under the Whistleblower law.

 Mr. Tucci argues that Gilead receives public money given the cyclical nature of buying and selling drugs generally—that is, after the pharmacy (the direct recipient of Medicaid funds) receives its reimbursement, it can use that money "to purchase more . . . drugs from the wholesaler[,] who purchases more . . . drugs from Gilead[.]"  ECF 127, p. 14.  There are at least two problems with this argument.

 First, from just a factual perspective, there is no evidence or even a reasonable inference to support this argument.  *Springs v. Prime Care Med., Inc.*, No. 15-2684, 2016 WL 1660597, at *5 (E.D. Pa. Apr. 27, 2016) ("Nor is the Court required to give the non-moving plaintiff the benefit of unreasonable inferences.").  Mr. Tucci's position assumes without evidence the existence of a closed pipeline of money flowing from Gilead to the government and back again—but he needs more concrete facts than that at summary judgment.  *Gloukhova v. CSL Behring LLC*, No. 22-2223, 2023 WL 6050217, at *3 (E.D. Pa. Sept. 15, 2023) (rejecting argument at summary judgment that whether defendant received public money through reimbursements raised genuine dispute of fact where plaintiff proffered only conjecture that "reimbursement payments to providers eventually trickle their way down to drug manufacturers").[3]

 Second, even if there were some factual support for this argument, there isn't any legal support for it.  The cases in this context all suggest that there must be some form of ***direct*** payment—*e.g.*, Medicaid reimbursements directly to the "employer" in exchange for services.  *See, e.g.*, *Heckman v. UPMC Wellsboro*, No. 20-01680, 2021 WL 2826716, at *19 (M.D. Pa. July 7, 2021) (a hospital is an "employer" as defined by

---

[3] At best, the evidence shows that the ***wholesaler*** that buys drugs from Gilead is an "employer" under the Whistleblower Law because it receives money from UPMC, a public body.

the Whistleblower Law when it received money from a "public body" in exchange for the provision of services); *Gratz v. Ruggiero*, No. 16-3799, 2017 WL 2215267, at *7 (E.D. Pa. May 19, 2017) (explaining that the purpose of the 2014 amendment to the definition of "employer" was to "'expand coverage of the law to include employees of companies that are *performing services for public bodies* with public monies'") (emphasis added) (quoting Brian L. Ellis, Pa. H.R. Co-Sponsorship Memoranda, H. Bill 105 (Jan. 11, 2013)); *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 475 n.8 (Pa. Super. 2017) (health system is an "employer" within the meaning of the Whistleblower Law when it received funds from the Commonwealth through its participation in the Medicaid program); *Adams v. HCF Mgmt.*, No. 18-47, 2018 WL 3388404, at *3 (W.D. Pa. July 12, 2018) (a private corporation is an "employer" because it received money from the Medicaid program); *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 576 (Pa. Super. Ct. 1999) (privately-owned nursing care facility is a "public body" because it receives Medicaid reimbursements).

There is no support for expanding the Whistleblower Law to a type of stream-of-commerce theory, where any Commonwealth money trickling through intermediaries in the stream of commerce would turn an entity into an "employer" for purposes of the statute. *See Gloukhova*, 2023 WL 6050217, at *2-3 (E.D. Pa. Sept. 15, 2023) (no genuine dispute of fact to establish that drug manufacturer received Medicare and Medicaid reimbursement—as required to qualify as a "public body"—when the evidence only showed Medicare and Medicaid reimbursements go to healthcare providers, not to drug manufacturer itself, and despite testimony suggesting that reimbursement payments to providers eventually trickle down to drug manufacturer).

Again, the Whistleblower Law contains a clear limiting principle: "employees of private companies that touch the same Commonwealth funds as the public body—

here, UPMC—receive whistleblower protection." *Tucci*, 2023 WL 2139931, at *3. The record lacks any evidence that Gilead touches the same Commonwealth funds as UPMC,[4] so Gilead is not an "employer" under the law and Mr. Tucci is not entitled to its protection. The Court therefore grants summary judgment for Gilead on Count I of the second amended complaint.

## II.    There is sufficient evidence and material disputes of fact to allow aspects of Mr. Tucci's claim for wrongful discharge to proceed.

Mr. Tucci's remaining claim is for wrongful discharge under Pennsylvania common law. His employment with Gilead was at-will, and an at-will employee in Pennsylvania can bring a wrongful-discharge claim "only in the most limited circumstances, where the termination implicates a clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009). Courts have recognized three limited scenarios where an at-will employee may maintain an action for wrongful discharge as a matter of public policy: "where the employer discharges an employee for refusing to commit a crime, where the employer discharges an employee for complying with a statutorily imposed duty, or where the employer is specifically prohibited from discharging the employee by statute." *Deal v. Children's Hosp. of Philadelphia*, 223 A.3d 705, 712 (Pa. Super. Ct. 2019).

Mr. Tucci argues that the public-policy exception applies to him because Gilead terminated his employment after he refused to engage in criminal conduct, citing five statutory frameworks.[5] ECF 127, pp. 23-24. To get past summary judgment, Mr.

---

[4] To be clear, the Court's prior opinion (as well as this one) are not meant to suggest that the Commonwealth funds necessarily need to be the "same" in the sense that there is some type of tracing requirement or that the waste be linked to ear-marked funds. But, here, there is no evidence that Commonwealth funds of any kind were directly paid to Gilead, as opposed to being directly paid to other entities.

[5] None of the statutes to which Mr. Tucci cites creates a statutory duty to report that applies to him, and none of them prohibit Gilead from terminating Mr. Tucci. Thus, the Court only assesses whether Mr. Tucci was terminated for refusing to commit a crime.

Tucci must produce sufficient evidence to establish that (1) Gilead required him to commit a crime, (2) he refused to do so, and (3) he was fired because of his refusal. *Capriotti v. Rockwell*, No. 19-3136, 2020 WL 6799172, at *4 (E.D. Pa. Nov. 19, 2020). Mr. Tucci must show that the activity he was required to engage in was, in fact, illegal—it's not enough that he believed that the activity was illegal (even if his belief was reasonable). *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 333 (3d Cir. 1993). The Court addresses each alleged criminal conduct and corresponding statute in turn.

### A.    Mr. Tucci's refusal to obtain the confidential UPMC memo.

Mr. Tucci's first basis for wrongful discharge concerns an order from Mr. Vautier to obtain the confidential UPMC memo or algorithm about UPMC's policy for prescribing Gilead's drugs. There is evidence in the record that Mr. Tucci's supervisor asked him to obtain a copy of the memo. ECF 120, p. 8; ECF 127, p. 4; ECF 131, p. 8. The only questions are: (1) whether obtaining this memo would violate a criminal law; and (2) whether Mr. Tucci has sufficiently shown that he was terminated because of his refusal to obtain the UPMC memo.

Mr. Tucci argues that theft of the UPMC memo would have exposed him to criminal charges under 18 Pa. C.S. § 3930, the statutory framework for theft of a trade secret.[6] ECF 127, p. 24. Section 3930(b) provides: "A person is guilty of a felony of the third degree if he, with intent to wrongfully deprive of, or withhold from the owner, the control of a trade secret, or with intent to wrongfully appropriate a trade secret for his use, or for the use of another: (1) unlawfully obtains possession of, or access to, an article representing a trade secret; or (2) having lawfully obtained

---

[6] Mr. Tucci also argues that wrongfully obtaining the UPMC memo would be a violation of the Pennsylvania Uniform Trade Secrets Act (12 Pa. C.S. § 5301, *et seq.*). ECF 127, p. 24. But that law creates a civil cause of action, not criminal liability, so it cannot support Mr. Tucci's claim. *See, e.g.*, 12 Pa. C.S. § 5308 ("this chapter displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret.").

possession of an article representing a trade secret, or access thereto, converts such article to his own use or that of another person, while having possession thereof or access thereto makes, or causes to be made, a copy of such article, or exhibits such article to another." 18 Pa. C.S. § 3930(b).

There are four elements to a trade secret as defined in Section 3930: (1) the secret concerns the whole or portion or phase of scientific or technical information, design, process, procedure, formula, or improvement; (2) the information is of value; (3) the information is confidential; and (4) the information has not been published or otherwise become a matter of general public knowledge. 18 Pa. C.S. § 3930(e). At this stage, the Court finds that there are genuine disputes of material fact as to whether the UPMC memo and algorithm are trade secrets under Section 3930.

First, a jury could reasonably find that the memo or algorithm contained scientific or technical information. According to a UPMC employee, the memo discussed "which medications would be on what tier level of UPMC's insurance and what they were willing to pay for." ECF 128-9, Ex. 75, 13:16-18. Mr. Tucci described the corresponding algorithm as a "complex chart" that instructed physicians when to prescribe Mavyret and when to prescribe Gilead's drugs, based on a patient's state. ECF 121-1, Ex. 1, 131:14-132:11. Mr. Tucci said that the UPMC physician who showed him this complex chart called it an "algorithm." *Id.* at 132:6. A reasonable jury could conclude that the memo or algorithm contained scientific or technical information about specific medications and UPMC's prescription practices.

Second, there is evidence that the memo and algorithm were "of value." The key feature of a trade secret is its "competitive value to the owner" vis-à-vis its market competition. *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014) (analyzing civil PUTSA). A memo that discusses "which medications would be on what tier level of UPMC's insurance and what they were willing to pay for" would contain pricing information that could be valuable to UPMC's competitors if they

obtained the memo. ECF 128-9, Ex. 75, 13:16-18. For example, if competitors knew what UPMC was willing to pay for the drugs, they could use this information to negotiate lower rates. Additionally, the detailed treatment information in the algorithm would give UPMC a competitive advantage.

Third, there is evidence suggesting that the memo and algorithm were confidential. At least two UPMC employees indicated the confidential nature of the documents to Mr. Tucci and told him that they couldn't share the documents with him. ECF 121-1, Ex. 1, 126:15-127:18, 133:15-17.

Fourth, while there is evidence in the record that the memo and algorithm became public knowledge (and thus might not be a trade secret), that is ultimately a disputed inference for the jury to draw. On one hand, Mr. Tucci testified that, during the Community Liver Alliance conference attended by about a hundred people, there was a "buzz" around the room that UPMC had selected Mavyret as the exclusive drug. *Id.* at 72:25-74:1. On the other hand, this testimony stops short; for example, a jury could find this "buzz" isn't sufficient evidence that the memo was public knowledge, or the jury could find that that while that specific information about Mavyret was known, the algorithm and other confidential information in the memo were not.

Thus, there is sufficient evidence to support a jury finding that the memo and algorithm were trade secrets.

There is also sufficient evidence that Mr. Tucci was instructed to commit a crime—theft of the memo. Under 18 Pa. C.S. § 3921(a), a person is "guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof."[7] The record shows that Mr. Vautier persistently asked Mr. Tucci to get a copy of the UPMC memo or algorithm—despite being told by Mr. Tucci and others that these were confidential documents. ECF 121-1, Ex. 1,

---

[7] "Movable property" refers to "[p]roperty the location of which can be changed" and includes documents. 18 Pa. C.S. § 3901.

121:22-122:17, 134:1-2; ECF 121-9, Ex. 9, 13:23-25; ECF 121-29, Ex. 29; ECF 121-30, Ex. 30; ECF 121-45, Ex. 45; ECF 128-9, Ex. 75, 19:7-19.

While Gilead argues that Mr. Tucci was never asked to obtain the UPMC memo by unlawful means, there is evidence for a jury to find that Mr. Vautier's persistent requests and ongoing pressure for Mr. Tucci to get a copy of the memo—despite knowing its confidential nature—was an attempt to have Mr. Tucci steal the memo. *See Capriotti v. Rockwell*, No. 19-3136, 2020 WL 6799172, at *5 (E.D. Pa. Nov. 19, 2020) (even if employee admitted she was not asked to commit perjury, a jury could still find that her boss's harassments, threats, and other conduct was an attempt to have the employee perjure herself). "A jury is to determine whether [Mr. Vautier's] conduct actually amounted to a request" for Mr. Tucci to unlawfully obtain the UPMC memo. *Id.* at *6.

As to whether Mr. Tucci has sufficiently shown that he was terminated because of his refusal to obtain the confidential UPMC documents, the Court finds that he has done so. He testified that Mr. Vautier told him they would both lose their jobs by the end of 2018 if they couldn't get a copy of the memo and that Mr. Vautier conveyed to him that it was his job to get the memo because UPMC was his territory. ECF 121-1, Ex. 1, 134:9-10, 135:1-2. Mr. Tucci did not attempt to obtain the UPMC documents after he learned that they were confidential. ECF 121-30, Ex. 30, p. 3. He told Mr. Vautier that he couldn't get them because they were confidential, and, in August 2018, when it became clear that they wouldn't be able to secure the documents, according to Mr. Tucci's retaliation complaint to Gilead's legal department, this is the point where Mr. Tucci began to receive negative field contact evaluations from Mr. Vautier. ECF 121-1, Ex. 1, 133:15-134:2; ECF 121-29, Ex. 29. Mr. Tucci also told Gilead's Director of Employee Relations, who investigated his retaliation complaint, that he thought Mr. Vautier rated him "off-track" for his mid-year 2018 review because he had failed to get the UPMC documents. ECF 121-30, Ex. 30, p. 5. There

are sufficient facts to create a causal chain between the instruction to steal the memo and the termination. Based on this evidence, a jury could reasonably find that Mr. Tucci was terminated for not obtaining the confidential UPMC documents.

**B.      Inaccurate fingertip formularies.**

Mr. Tucci next argues that Gilead terminated his employment because he raised in his Business Conduct Report that the "formulary information" contained in Gilead's "fingertip formularies" was inaccurate. ECF 127, pp. 26-27. He describes these fingertip formularies as "charts prepared by a [third-party] contractor that identify whether Gilead products are on formulary" and that were used by Therapeutic Specialists to communicate to prescribing physicians whether Gilead products were on the formulary. *Id.* at 6, 26-27. He argues that supplying inaccurate formulary information violated the Pennsylvania Controlled Substance, Drug, Device, and Cosmetic Act (35 P.S. § 780-113(3), (28)) and Pennsylvania criminal law proscribing insurance fraud (18 Pa. C.S. § 4117). *Id.* at 26-27.

Even assuming that the use of inaccurate fingertip formularies is a crime, there isn't sufficient evidence in the record that Mr. Tucci was required to use the formularies and that he was terminated because he refused to engage in unlawful conduct related to the formularies. Mr. Tucci's only evidence that he was required to use the formularies is the 2018 Business Conduct Report, in which he vaguely wrote that the "tools I am required to use may, at the least, create risk related to truthful promotion, [and] accurate reporting of insurance coverage . . . ." ECF 121-25, Ex. 25; ECF 127, p. 27. There is nothing to support the inference that Mr. Tucci was referring to the fingertip formularies in his Business Conduct Report, and more is needed to survive summary judgment. Neither does the record establish that he was fired because he refused to engage in actual unlawful conduct related to the fingertip formularies. He only testified that he stopped using the formularies because "they

were so inaccurate[,]" but he could not recall when he stopped using them.  ECF 128-1, Ex. 67, 190:3-16.

To survive summary judgment, Mr. Tucci must do more than report unlawful conduct—he must show that he "was fired for refusing to engage in *actual* unlawful conduct[.]"  *Martinez v. Rapidigm, Inc.*, No. 02-1106, 2007 WL 965899, at *16 (W.D. Pa. Mar. 29, 2007) (Conti, J.) (emphasis in original), *aff'd*, 290 F. App'x 521 (3d Cir. 2008).  Because the record does not establish that Mr. Tucci was terminated for refusing to engage in actual unlawful conduct related to the fingertip formularies, this theory may not be presented to the jury at trial.

### C.    "Selling the spread."

Lastly, Mr. Tucci argues that he was terminated for refusing to "sell the spread," which refers to "the difference between the price at which [a covered] entity purchases a product…and the price that a payer, or PBM, reimburses that entity for dispensing the product."  ECF 127, pp. 28-29; ECF 128-6, Ex. 72, 97:3-12.  He says that "selling the spread" violates the Pennsylvania Medicaid Anti-Fraud statute, which imposes criminal penalties.  62 P.S. § 1407; ECF 127, p. 28.

Under the relevant part of the statute, it is unlawful to "[s]olicit or receive or to offer or pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or in kind from or to any person in connection with the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program or in connection with referring an individual to a person for the furnishing or arranging for the furnishing of any services or merchandise for

which payment may be made in whole or in part under the medical assistance program." 62 P.S. § 1407(2).

The Court finds that there are material factual disputes as to whether selling the spread violates the statute.

First, Mr. Tucci has sufficiently shown that the practice of selling the spread could qualify as a "renumeration, including any kickback, bribe or rebate" under the statute. In the 2018 Business Conduct Report, Mr. Tucci stated that he observed Gilead employees "selling" customers on the "financial benefits" of using Gilead's drugs in the 340B program. ECF 121-25, Ex. 25. Mr. Tucci testified that, during a meeting, he saw Mr. Durr tell a UPMC physician to look at Gilead's drugs "through the 340B lens, and evaluat[e] whether that would be better for their program monetarily[.]" ECF 121-1, Ex. 1, 165:16-25. According to Mr. Tucci, "the UPMC people in every instance I can think of…ignored the discussion or steered away from it." *Id.* at 169:10-14. Gilead also cautioned Mr. Durr that it was "vitally important" that no one get "involved in any discussions regarding 340b pricing." ECF 121-65, Ex. 65. According to an email Mr. Tucci drafted and sent to himself, Mr. Vautier told him that Mr. Durr can have a "more in depth 340b benefits discussion" if he spoke with a UPMC physician outside of her office, because "no [appointment] record at UPMC = greater plausible deniability and easier to deny meeting discussion points." ECF 121-44, Ex. 44. Viewing these facts in Mr. Tucci's favor, a reasonable jury could find that selling the spread amounts to an illegal kickback or bribe to induce UPMC physicians to prescribe Gilead's drugs.

Second, Mr. Tucci has shown that he was directed to "offer or pay" renumeration to someone by selling the spread. In emails that he drafted and sent to himself in April and June of 2018, Mr. Tucci repeatedly noted that Mr. Vautier pushed him to sell the spread, to "convey 340b to UPMC[,]" and to convey the financial

benefits of the 340B program.[8]  *See* ECF 121-22, Ex. 22; ECF 121-42, Ex. 42, p. 5 (Mr. Vautier told Mr. Tucci that he must "make sure" that UPMC understands that "effective April 1 the 340b discounting change will be enacted that will make use of our products create even greater money back to UPMC"); ECF 121-43, Ex. 43; ECF 121-44, Ex. 44.  Ultimately, a jury may believe that Mr. Vautier was merely advising Mr. Tucci to highlight the natural savings from prescribing Gilead's drugs or the mechanism of the 340B program, rather than selling the spread.  However, a jury could also reasonably conclude from the record that Mr. Tucci was pushed to sell the spread to UPMC physicians.

Third, Mr. Tucci has sufficiently shown that the practice of selling the spread is related to "the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program."  62 P.S. § 1407(2).  Under the 340B program, Gilead's drugs may eventually be reimbursed by Medicaid, although not necessarily so.  ECF 121-2, Ex. 2, 78:6-19.  But because the statute only requires that the reimbursement "*may* be in whole or in part" made by Medicaid, all that Mr. Tucci needs to show is the possibility that Medicaid is reimbursing for Gilead's drugs sold through the 340B program.  62 P.S. § 1407(2) (emphasis added).

As to whether Mr. Tucci was terminated because he refused to sell the spread, the Court finds that Mr. Tucci has presented sufficient evidence at this stage.  In an email he sent to himself in April 2018, he wrote that when Mr. Vautier asked if he had "talked 340b to anyone at UPMC[,]" he responded that he had not.  ECF 121-43,

---

[8] While Mr. Tucci's emails to himself are probably hearsay, under Fed. R. Civ. P. 56(c)(2), the emails can be used for summary-judgment purposes as long as they can be presented in a form that would be admissible in evidence.  At trial, Mr. Tucci can testify as to the facts within the emails.  *See Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 WL 2106582, at *8 (W.D. Pa. Aug. 26, 2005) ("[T]he Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial." (cleaned up)).

Ex. 43, p. 3. In his retaliation complaint to Gilead's legal department, he noted that he had "not been selling customers relative to financial aspects of 340b[,]" leading Mr. Vautier to express "a lot of frustration" with the UPMC account in June 2018. ECF 121-29, Ex. 29, p. 3. Mr. Tucci also testified that, in June 2018, Mr. Vautier asked him to prepare written action plans, which Mr. Tucci never had to do before. ECF 121-1, Ex. 1, 210:23-211:21. He believed Mr. Vautier's requests were retaliatory because he was "picked out to do these things, not from a…position of help but from a position of punishment." *Id.* at 216:2-22. He believed that Mr. Vautier was retaliating against him because he didn't respond to Mr. Vautier's pressures to get the UPMC memo or sell the spread. *Id.* at 210:23-211:21. A jury could infer that Mr. Vautier's ensuing negative evaluations of Mr. Tucci's performance, in his mid-year and year-end reviews in 2018 and his field contact evaluations from mid-2018 through mid-2019, resulted from Mr. Tucci's refusal to sell the spread. *See* ECF 121-14, Ex. 14; ECF 121-23, Ex. 23; ECF 121-24, Ex. 24; ECF 121-27, Ex. 27; ECF 121-28, Ex. 28; ECF 121-32, Ex. 32; ECF 121-33, Ex. 33; ECF 121-34, Ex. 34.

Gilead argues that there was a legitimate reason for terminating Mr. Tucci in August 2019—namely, his failure to satisfy the objectives set forth in the PIP after more than a year of performance coaching. ECF 120, p. 29. It is true that, for a wrongful-discharge claim, "even when an important public policy is involved, an employer may discharge an employee if he has a separate, plausible, and legitimate reason for doing so." *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir. 1979) (cleaned up). However, in a situation where "the fact-finder can infer one conclusion which violates public policy and one which is plausible and legitimate, invasion of the jury's province is improper." *Id.* Because a reasonable jury could conclude that Gilead's proffered reason for terminating Mr. Tucci is pretextual and

that Mr. Tucci was terminated for refusing to sell the spread, this theory of wrongful discharge may proceed to a jury.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court will grant, in part, Gilead's motion, and will enter summary judgment in its favor on the Pennsylvania Whistleblower Law claim, but will deny Gilead's summary-judgment motion on aspects of the wrongful-discharge claim. A separate order follows.

DATED: November 6, 2024                    BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge