IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLASE TUCCI, | ) |
| | ) |
| Plaintiff, | ) 2:21-CV-1859-NR |
| | ) |
| v. | ) |
| | ) |
| GILEAD SCIENCES, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

**J. Nicholas Ranjan, United States District Judge**

On November 6, 2024, the Court issued an opinion, denying Gilead's motion for summary judgment on aspects of Blase Tucci's wrongful-discharge claim. ECF 134. After the Court issued its decision, Gilead moved for partial reconsideration, arguing that the Court committed clear error in determining that a jury could find that Mr. Tucci was asked by Gilead to commit trade-secret theft, and was then fired when he didn't do so. ECF 138. The parties then briefed that motion, so it's now ready for disposition. On careful review and for the reasons that follow, the Court will grant the motion.

A motion for reconsideration must rely on at least one of these grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

Gilead, focusing on the third ground (clear errors of law and fact), asks the Court to reconsider several aspects of the portion of the summary-judgment opinion on the wrongful-discharge claim premised on Mr. Tucci's trade-secret theft theory of the case. That theory was based on the claim that Gilead ordered Mr. Tucci to steal

a confidential UPMC memo (which was allegedly a trade secret), and when he was unable to procure it, fired him. The Court previously found that there were disputes of material fact as to this claim. Gilead takes issue with that finding, arguing that (1) the UPMC memo is not a trade secret; (2) there is insufficient evidence that Gilead instructed Mr. Tucci to commit a crime of trade-secret theft; and (3) there is insufficient evidence of a causal link between the failure to obtain the UPMC memo and Mr. Tucci's termination.

After a fresh look at the record, the Court agrees with Gilead as to its second argument. There is insufficient evidence to establish that Gilead instructed Mr. Tucci to commit a crime. Put another way, there is insufficient evidence to establish the requisite *mens rea* or *actus reus* to support the claim, and so the Court will grant reconsideration on that basis.[1]

As to *mens rea*, third-degree trade-secret theft requires the "intent to wrongfully deprive of, or withhold from the owner, the control of a trade secret, or [the] intent to wrongfully appropriate a trade secret for [one's] use[.]" 18 Pa. C.S. § 3930(b). In other words, trade-secret theft involves the intent to obtain unlawful possession of a trade secret. As to *actus reus*, trade secret theft involves the acquisition of a trade secret by *unlawful or improper means* or the *unauthorized* use of a trade secret.[2] This is consistent with how the Defend Trade Secrets Act (DTSA) and the Pennsylvania Uniform Trade Secrets Act (PUTSA) define "misappropriation"

---

[1] The Court does not address the other grounds for reconsideration that Gilead raises.

[2] A person commits third-degree trade-secret theft when he (1) "unlawfully obtains possession of, or access to," a trade secret or (2) "having lawfully obtained possession of . . . a trade secret, or access thereto, converts [it] to his own use or that of another person, while having possession thereof or access thereto makes, or causes to be made, a copy of [it], or exhibits [it] to another." 18 Pa. C.S. § 3930(b).

of trade secrets.[3] Further, for a wrongful-discharge claim premised on refusal to engage in unlawful conduct, "[t]he employee plaintiff must show that the course of action the employer wants the employee to take actually violates the law, and was indeed illegal." *Martinez v. Rapidigm, Inc.*, No. 02-1106, 2007 WL 965899, at *16 (W.D. Pa. Mar. 29, 2007) (Conti, J.) (cleaned up), *aff'd*, 290 F. App'x 521 (3d Cir. 2008).

The *mens rea* and *actus reus* elements here both really boil down to the same question: is there evidence that Gilead knowingly told Mr. Tucci to obtain the UPMC memo by unlawful means?

In reviewing the record, the Court concludes that there isn't sufficient evidence that Brian Vautier (or anyone else at Gilead) asked Mr. Tucci to obtain the UPMC memo by unlawful means or even that Mr. Tucci interpreted Mr. Vautier's request to obtain the UPMC memo as a request to obtain it by unlawful means.

Gilead points to Mr. Tucci's deposition as evidence that Mr. Vautier did not instruct him to commit a crime. Mr. Tucci testified:

> Q: So after you learned about this algorithm from the meeting with Dr. Dunn, what did you do, did you share that information with anyone?
>
> A: Oh, I'm certainly – I'm certainly sure. I don't have a recollection, but I know I shared it with Brian Vautier and I'm very confident I shared it with Joe Augustine as well.
>
> Q: Okay. What did Mr. Vautier tell you after you shared that information with him?

---

[3] Under both the DTSA and PUTSA, "misappropriation" means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret" without the owner's consent. 18 U.S.C. § 1839(5); 12 Pa. C.S. § 5302. "Improper means" under the DTSA includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means"—but doesn't include "lawful means of acquisition." 18 U.S.C. § 1839(6). "Improper means" under the PUTSA "[i]ncludes, but is not limited to, theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." 12 Pa. C.S. § 5302.

> A: He asked something to the effect of, did you get it or can you get it? And I told him no, Dr. Dunn said it's confidential.
>
> Q: Did he give you any other instruction about obtaining a copy of this algorithm?
>
> A: I don't know within that conversation after reporting it to him, but it was consistent . . . . When I said we can't get it, he'd say, well then who can we get it from.
>
> . . .
>
> Q: So other than asking you who you could get a copy of this algorithm or memo from, did he give you any other instructions on what you had to do to get a copy of it?
>
> A: No, it's pretty much this is pretty much your territory, it's your job to get it.
>
> Q: Okay. Did Mr. Vautier ever tell you, you had to use violence to get a copy of this memo or algorithm?
>
> A: No.
>
> Q: Did he ever tell you had to use force to get it?
>
> A: Not physical force but his actions with Kathy [Freehling] are a type of force. . . . I would categorize that as emotional force because she likes me and wants to help us.
>
> Q: And so you're referencing when Mr. Vautier told [ ] Ms. Freehling. . . that if he didn't get a copy of it he might lose his job or you might lose your jobs?
>
> A: He tell her we would both lose our jobs by the end of the year.
>
> Q: Okay. Are you referring to anything else in terms of force?
>
> A: No[.]
>
> . . .
>
> Q: And did Mr. Vautier tell you that you had to trespass or break into UPMC's computers or building to get a copy of it?
>
> A: No. But incidentally, I -- I took the initiative to look at as much public records as I could see to see if there's any hint of anything that

-4-

they're not calling proprietary that gives us the information that's being looked for.

ECF 121-1, Ex. 1, 133:6-135:16. Mr. Tucci further testified that he didn't think he was doing anything unlawful in sending a UPMC physician an email asking if she could provide a copy of the memo. *Id.*, 289:2-290:6.

At best, the record shows that Mr. Vautier consistently asked Mr. Tucci to get a copy of the UPMC memo, even after being told at some point that it was a confidential document. *Id.*, 121:22-122:17; 133:13-17.

In its prior decision, the Court found that Mr. Vautier's persistent pressure on Mr. Tucci to obtain a confidential memo was enough to create a jury issue on this question. Specifically, the Court previously found: "While Gilead argues that Mr. Tucci was never asked to obtain the UPMC memo by unlawful means, there is evidence for a jury to find that Mr. Vautier's persistent requests and ongoing pressure for Mr. Tucci to get a copy of the memo—despite knowing its confidential nature—was an attempt to have Mr. Tucci steal the memo." *Tucci v. Gilead Scis., Inc.*, 756 F. Supp. 3d 8, 18 (W.D. Pa. 2024) (Ranjan, J.).[4]

---

[4] Even if a wrongful-discharge claim can be premised on an employer implicitly requiring an employee to do something illegal, Mr. Vautier's persistent requests for the memo (*i.e.*, asking Mr. Tucci, "did you get it or can you get it" or "who can we get it from" or otherwise instructing him to ask UPMC employees for it) likely isn't enough, as a matter of law, to show that he directed Mr. Tucci to commit a crime. *See Scheu v. Charter Commc'ns, LLC*, No. 08-02835, 2011 WL 3204672, at \*21 (C.D. Cal. July 27, 2011) (no evidence that employee was asked to commit a crime where he testified that he was pressured to increase sales, but was never directed to make a misrepresentation to an advertiser); *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1491-92 (8th Cir. 1992) (clearly erroneous to conclude that supervisor's stern, disapproving look when plaintiff showed him the subpoena constituted a demand that plaintiff break the law by perjuring himself at the trial or avoiding the subpoena); *Brennan v. Cephalon*, No. 04-3241, 2007 WL 1382801, at \*5 (D.N.J. May 8, 2007) (granting summary judgment where there was no evidence that plaintiff was told by anyone at company to submit false information to the FDA); *Whitney v. Xerox Corp.*, No. 94-3852, 1905 WL 1632, at \*7 (E.D. Pa. Sept. 29, 1995) (granting summary judgment where plaintiff was never asked by employer to take affirmative illegal action or make any omission to hide the alleged fraud).

After another review of the record, the Court finds that it erred here by not fully taking into account Mr. Tucci's testimony.

As noted above, Mr. Tucci's own testimony makes clear that he was not asked to do anything illegal, or given any instructions as to how to illegally obtain the memo. Mr. Tucci specifically testified that Mr. Vautier didn't give him any instructions on how he should get a copy of the memo. Therefore, there isn't sufficient evidence that what he was asked to do "was actually wrongful[,]" *e.g.*, that Mr. Vautier (or anyone else at Gilead) requested Mr. Tucci to acquire the memo through improper means. *Martinez*, 2007 WL 965899, at *16.

Further, Mr. Tucci's testimony indicates that he did not interpret Mr. Vautier's request to mean that he must obtain the memo through unlawful means: in fact, he testified that he did not think it was unlawful to ask a UPMC physician for a copy of the memo. ECF 121-1, Ex. 1, 289:2-290:6. He further testified that he took initiative to look at public records to see if there were other ways to get the information contained in the memo. *Id.*, 135:11-16. So, at best, the record could suggest that, from communicating with UPMC providers, Mr. Tucci got the sense at some point that "maybe we're not supposed to have this [memo,]" *id.*, 84:21-85:9, that acquiring "private UPMC documents" is against Gilead's internal "corporate policy[,]" ECF 128-17, Ex. 83 (February 8, 2018, email to self), and eventually learned at some point that the memo was "confidential[,]" ECF 121-1, Ex. 1, 127:17-25, after which he decided he "[would] not attempt to secure confidential UPMC documents, but will ask . . . if there are any public documents that satisfy" what Mr. Vautier was looking for. ECF 121-45, Ex. 45.

Finally, the Court would note that there is nothing in Mr. Vautier's testimony that would create a dispute of fact on this issue. *See* ECF 121-3, Ex. 3, 80:1-10 (Mr. Vautier testifying that Mr. Tucci only reported that he had tried to obtain the memo, but UPMC wasn't able to provide it to him); ECF 128-2, Ex. 68, 78:8-25 (Mr. Vautier

testifying that he was aware Mr. Tucci communicated with UPMC about the memo, but did not know who at UPMC Mr. Tucci spoke to).

None of this evidence is enough to create a genuine dispute of fact that Mr. Tucci was required to commit a crime or that he knew Mr. Vautier was asking him to commit trade-secret theft. Put differently, nothing suggests that Mr. Tucci was aware that he would be committing a crime, let alone trade-secret theft, by asking UPMC employees to see if they were willing to show him the memo; and a violation of internal corporate policy does not amount to unlawful conduct. *See Martinez*, 2007 WL 965899, at *16 (granting summary judgment where "plaintiff never did anything that she believed was unlawful . . ., never signed any document knowing that the information therein was inaccurate, never engaged in fraud or anything unlawful," and "merely speculated, [but] did not know, that the petitions [she was directed to sign] were in fact inaccurate or that she would commit 'fraud' or 'perjury' by signing them"); *Bahnatka v. Victory Brewing Co., LLC*, 239 A.3d 54, 2020 WL 3866059, at *6 (Pa. Super. Ct. 2020) ("The public policy exception is not intended to protect employees who question internal business practices that are not criminal acts." (cleaned up)).

Therefore, the Court concludes that Mr. Tucci hasn't put forth sufficient evidence to show that Gilead terminated him for refusing to commit a crime, and given the state of the record here, it would simply be too speculative to allow the trade-secret theft aspect of the claim to go to the jury. The Court will grant Gilead's motion for reconsideration on this basis.

\* \* \*

Accordingly, after careful consideration, it is hereby **ORDERED** that Gilead's motion for reconsideration is **GRANTED**. Mr. Tucci may not proceed on the theft-of-trade-secret theory at trial; his wrongful-discharge claim at trial shall be limited to his "selling the spread" theory.

Date: April 30, 2025                                             BY THE COURT:

                                                                 /s/ J. Nicholas Ranjan
                                                                 United States District Judge